No. 13243

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

GEORGE RAUSER and PHYLLIS A.
RAUSER, husband and wife,

                Plaintiffs and Respondents,

    -vs-

THE TOSTON IRRIGATION DISTRICT, MAURICE L.
HUNSAKER, FRANK J. SLIFKA, and SAMUEL F.
KIRSKEY, the members of the Board of Commissioners
of said TOSTON IRRIGATION DISTRICT,

                Defendants and Appellants.

---

Appeal from:  District Court of the First Judicial District,
              Honorable Peter Meloy, Judge presiding.

Counsel of Record:

    For Appellants:

        Corette, Smith and Dean, Butte, Montana
        Kendrick Smith argued and Gerald Allen argued, Butte,
         Montana
        Holter, Heath and Kirwan, Bozeman, Montana

    For Respondents:

        Harrison, Loendorf and Poston, Helena, Montana
        James T. Harrison, Jr. argued, Helena, Montana

    For Amicus Curiae:

        Thomas Olson, Billings, Montana
        Alvin E. Bielefeld argued, Billings, Montana

---

                Submitted:  March 17, 1977

                Decided: JUN -6 1977

Filed: JUN 6 1977

*Thomas J. Kearney*
                   Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

George Rauser and Phyllis Rauser, husband and wife, brought this action in the district court, Broadwater County, against the Toston Irrigation District and members of the Board of Commissioners of that District. The complaint alleged a portion of Rausers' land was taken without compensation, and construction of the irrigation project with resultant seepage caused water to stand stagnant on approximately forty acres of plaintiffs' land situated along Warm Spring Creek. It alleged this amounted to the taking of a flood easement.

Defendant's motion to strike the individual board members as parties was granted. Trial was had before a jury and a verdict returned in favor of Rausers in the amount of $100,000.

The Toston Irrigation Project consists of the Crow Creek pump unit and a water delivery system built as a part of the Missouri River Basin Project. The land to be irrigated was to serve as a replacement for lands flooded by Canyon Ferry Reservoir. The project began in 1955 with fewer than a thousand acres under irrigation. At present it covers nearly five thousand acres.

Plaintiffs are not members of the Toston Irrigation District but their land is bounded one one side by land in the District. The acreage alleged taken is at a lower elevation than land in the District.

Each party presented expert hydrological testimony and expert valuation testimony. Plaintiffs' hydrological expert testified the source of the water on the Rauser property was to the south and east, basing his opinion on well readings taken over a substantial

number of years. Along with other factors, he took into consideration the extent of irrigation in the District and the rainfall. He also read into evidence from a United States Geological Survey document entitled "Geology and Occurrence of Ground Water in Townsend Valley, Montana" the following statement:

"The application of additional irrigation water to the benchland flanking Warm Spring Creek will increase the extent of waterlogging in the bottom land unless provision is made for more adequate drainage. In this part of the valley the Tertiary sand and gravel deposits, which are mantled by permeable windblown soil, are underlain by beds of hardened clay, locally referred to as 'hardpan.' If water is applied to these lands, a gradual rise in the water table will take place. This rise will result in the increased flow of existing springs in the lower part of the valley, and new springs will appear along the slope from the benchland to the valley bottom. In this area the valley bottom is underlain by relatively impermeable fine-textured clay. The capillary fringe above the water table will rise to the surface in much of the bottom land, saline soil will develop, and the land will eventually become unproductive. Water logging will become more extensive if irrigation water is applied to the benchland that lies at a higher elevation than the present irrigated land unless provision is made for more adequate drainage. This condition will exist not only in the Crow Creek area but also in other parts of the valley where additional irrigation is planned."

The expert indicated his findings confirmed this prediction.

George Rauser testified the diminution of value because of the "taking" totaled $100,000. Plaintiffs' expert valuation witness testified the loss was in the range of $35,000 basing his opinion on comparable sales of three nearby parcels.

Defendant's hydrological expert testified the cause of the flooding on plaintiffs' land was the enlargement of plaintiffs' own irrigation ditch which created a barrier to the natural drainage of the land. Defendant's valuation expert placed the total loss at $26,000.

The parcel affected by the water includes the land where plaintiffs' home, shop and outbuildings are located. The United States government built and owns the physical assets of the irrigation system. Almost from the beginning of irrigation on the project, there have been negotiations between Rausers and the District about the flooding of the land and proposals to drain it. The District went so far as to draw up plans and obtain bids for a drain system, but because the bid was substantially more than expected nothing further was done.

The Toston Irrigation District appeals. We summarize the issues as these:

(1) May an irrigation district exercise the power of eminent domain on a project whose physical assets are owned by the federal government?

(2) May there be a condemnation of property without a showing of negligent design, construction, or operation of the project.

(3) Was the action barred by laches?

(4) Was the verdict supported by substantial credible evidence?

(5) Are attorney fees allowable?

(6) Was there an adequate description of the land here involved?

Issue (1)  The power to condemn property is granted to irrigation districts by Montana statute, section 89-1301(3), R.C.M. 1947, and states:

> "(3)  The board * * * shall also have power and authority to acquire by purchase, lease, contract, condemnation, or other legal means, lands (and rights in lands) for rights of way, for reservoirs, for the storage of needful waters, and for dam sites, and necessary appurtenances, and such other lands and property as may be necessary for the construction, use, maintenance, repair, improvement, enlargement and operation of any district system of irrigation works."

That the physical assets are owned by the United States government does not limit the power to condemn. Section 89-1301(7) clearly indicates substantial federal involvement is contemplated in "construction, operation, and maintenance of the necessary works for the delivery and distribution of water therefrom * * *." Defendant argues the trial court lacked jurisdiction because the physical assets are owned by the United States. This argument must fail for no efforts were made on the part of defendant to remove the case to federal court and no case authority is cited or relied upon to support defendant's position.

While the District questions whether there was in fact a taking here and the compensability of it, case law holds there can be a taking without a total physical appropriation of land. Here the District did not condemn the land, rather it caused the land to be permanently invaded by the percolation of water. Similar fact cases have been considered by the United States Supreme Court recognizing the rights of the damaged landowner. United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L ed 1277; United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L ed 539; 2 Nichols on Eminent Domain, Taking and Damage §6.32.

Issue (2). Whether there may be a taking by the District without a showing of negligence in design, construction, or operation of the District?

In actions for damage for seepage the rule as stated in Fleming v. Lockwood, 36 Mont. 384, 391, 92 P. 962, and quoted in Rhodes v. Weigand, 145 Mont. 542, 549, 402 P.2d 588, is:

"* * * If, in fact, the seepage occurred as plaintiff contends, it must have been the result of negligence on Lockwood's part, either in constructing or operating the ditch, since it is not contended that it was the result of inevitable accident or was caused by an act

- 5 -

of God; and therefore the plaintiff had the burden of proof, in the first instance, <u>to show negligence</u> on the part of the defendant."

The District cites <u>Fleming</u> as authority for the fact that to have a recovery here there must be intentional or negligent acts. <u>Fleming</u>, a negligence case, provided for payment in the case of intentionally caused torts. The District cites <u>Rhodes</u> as authority, but there this Court provided for the issuance of an injunction, noting:

> "The record in this cause discloses with clarity that appellant in the year 1947, again in 1961 and again, after complaint had been made to him of flooding in the year 1962, persisted in his negligent and deliberate acts."

Montana's case law does not require a showing of negligence or a theory of negligence when faced with deliberate or intentional acts. In Calvert v. Anderson, 73 Mont. 551, 555, 236 P. 847, the Court held:

> "It is the rule in this state that the owner of an irrigating ditch is not an insurer thereof and is liable only for damages caused by his willful acts or by his negligence in constructing, maintaining or using his ditch."

However, as we will discuss later, <u>Fleming</u> and <u>Rhodes</u> are not applicable to the facts of the instant case.

In <u>Rhodes</u> the court found that the rule which requires a showing of negligence was met by deliberate acts, the flooding of plaintiff's land.

The instant action is one for inverse condemnation. The 1972 Montana Constitution, Art. II, Section 29, provides:

> "Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails."

- 6 -

An early Montana case, Less v. City of Butte, 28 Mont. 27, 32, 72 P. 140, in construing this identical language in the 1889 Constitution "Private property shall not be taken or damaged for public use without just compensation * * *" said:

"* * * Under constitutions which provide that property shall not be 'taken or damaged' it is universally held that 'it is not necessary that there be any physical invasion of the individual's property for public use to entitle him to compensation.' * * *'These easements are property, protected by the constitution from being taken or damaged without just compensation.' * * * Moreover, it may frequently occur that 'the consequential damage may impose a more serious loss upon the owner than a temporary spoliation or invasion of the property.'"

In the ordinary condemnation case necessity, valuation and the like are the issues to be determined---fault or negligence are not considered authority. The rule stated in Fleming that an irrigation district is not an insurer of its ditches from damage as a result of acts of God or against occasional damage which occurs even though the district has exercised due care, does not apply to the facts here. Here the damage done by the project was foreseeable and foreseen. It was inevitable that Rausers' land would be damaged by the construction of the project, absent remedial work. Almost from the outset Rausers sought to have the damage remedied and as the amount of water used by the project increased, so did the Rausers' complaints. Where, as here, the damages are known or knowable and are an inevitable result of the intentional undertaking of the project, there is no need to show negligent design, construction or operation. It is enough to show the damages were proximately caused by the undertaking of the project and a reasonable foreseeable consequence of the undertaking. It is implicit in inverse condemnation that the extent of the damage be of such a degree as to amount to a taking of an interest in the property damaged. Albers v. County of Los Angeles, 42 Cal.Rptr. 89, 96, 398 P.2d 129, 136; 20 Hastings Law Journal 431.

Historically it appears inevitable to each new irrigation project that certain unexplained and unplanned for problems arise that damage adjacent property owners. In many instances there is no negligence or other wrongful conduct or omission on the part of defendant. The injured property owners have sought redress for damages on the alternative theories of inverse condemnation and tort, as applied to the facts. Bauer v. County of Ventura, 45 Cal.2d 276, 289 P.2d 1; Granone v. County of Los Angeles, 231 Cal.App.2d 629, 42 Cal.Rptr. 34.

Outstanding in the cases of this type is the holding of the California Supreme Court in Albers:

"From the foregoing analysis of the cases and other legal authorities it is apparent that we are not required to choose between two absolute rules, one of liability and one of nonliability, but are faced with a more limited issue. The question is not whether in all cases, a property owner should not be permitted to recover in an inverse condemnation action if a private party would not be liable for damages similarly inflicted, but whether there is or should be a qualification or limitation of that rule to the effect that the property owner may recover in such an action where actual physical damage is proximately caused to his property by a public improvement as deliberately planned and built * * *." 398 P.2d 136.

The California Court concluded that such damages are compensable and adopted five factors for consideration. We find this case applicable to the instant case and adopt as guides the five factors. 1) The damage to this property, if reasonably foreseeable, would have entitled the property owners to compensation; 2) the likelihood of public works not being engaged in because of unforeseen and unforeseeable possible direct physical damage to real estate is remote; 3) the property owners did suffer direct physical damage to their properties as the proximate result of the works as deliberately planned and carried out; 4) the cost of such damage can better be absorbed, and with infinitely less hardship, by the taxpayers as a

- 8 -

whole, than by owners of the individual parcels, and (5) to quote from Clement v. State Reclamation Board, 35 Cal.2d 628,642, 220 P.2d 897, 905, "the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking."

The California Court then noted, quoting from an early opinion, Bacich v. Board of Control, 23 Cal.2d 343, 351, 144 P.2d 818, 823, quoting from Sedgwick on Constitutional Law:

> "'"The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes. * * *."'".

Issue 3. The District argues the action is barred by laches. The project was begun in 1955 and this action was not initiated until 1973. The evidence reveals that complaints were made to the District almost from the outset and remedial action was discussed until sometime just prior to the commencement of this action. Laches is an equitable defense. This Court in Davis v. Steingruber, 131 Mont. 468, 470, 311 P.2d 784, said:

> "Laches means negligence in the assertion of a right, and exists where there has been a delay of such duration as to render enforcement of the asserted right inequitable."

Here, as there, there is no unexplained delay which would justify the application of the doctrine of laches and there is no prejudice sufficient to justify the application of. laches. Thus the action is not barred by laches. The district"s actions lulled plaintiffs throughout the years between the beginning of the District and the filing of the action.

Issue (4). Is the verdict supported by the evidence? This involves two questions. First, was the United States Geological report entitled "Geology and Occurrence of Ground Water in the Townsend Valley,Montana" admissible into evidence over a hearsay objection? This document contains a detailed description of the

geography, geomorphology, geology, ground water, and chemical quality of the water and has a short summary and conclusion section. Plaintiffs' hydrology expert used the data in the nearly 50 pages of measurements of water level observation wells along with the general information in the document, as an aid in his analysis of the Rausers' problem. The expert testified as foundation that (1) the information was available to the public and others in his profession; (2) the document and others like it were recognized as authorities and relied upon by professionals in their field of work, and (3) the document was prepared in the normal course of business by the agency prior to the building of the irrigation project.

Section 93-1101-8, R.C.M. 1947, states:

"Historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are prima-facie evidence of facts of general notoriety and interest."

An early case interpreting section 93-1101-8, Lynes v. Northern Pacific Ry. Co., 43 Mont. 317, 329, 117 P. 81, discussed this section as it related to the admissibility of certain tables of results of tests made on air brakes on trains of different tonnage. The tables were offered to corroborate the expert's opinion and as independent evidence of the facts shown. The Court said:

"* * * if the proper preliminary proof is made, viz., that the book or chart offered is by a person indifferent between the parties litigant, is standard among the profession, trade or occupation to which it relates, and is accepted and acted upon as accurate, it should be admitted, upon the theory that the matters which it contains are facts of general notoriety and interest."

The document here involved is similar to the one involved in Lynes and was offered for substantially the same purposes. The foundation required for the admission, that it was prepared prior to litigation by parties indifferent between the parties and that it is

accepted as an authority and relied on as such, is sufficient assurance of the truth of the matters contained therein and thus excepts it from the requirement that the speaker be available for cross-examination.

We note here that the portion of the summary and conclusion read into evidence does not speak to the existence of present harm, only predicts such harm. It goes not to the truth of the issue, but to the knowledge or intent of the builders of the project.

The District argued the jury disregarded the evidence that the District was not responsible for any seepage past the point of delivery at the headgates. The evidence of where the seepage came from was a matter for the jury to decide and was decided against the contentions of the District. There was considerable evidence to support the jury's decision.

Second, as to the other challenges made to the determination of cause and the valuation--is there substantial credible evidence to support the verdict and judgment? That is the scope of this Courts review. State Highway Comm'n v. Vaughan, 155 Mont. 277, 470 P.2d 967.

As to cause, both parties presented a number of witnesses, including two highly qualified and extremely convincing expert witnesses who gave conflicting explanations of the cause of the injury. There is substantial credible evidence for the jury's findings of cause.

As to valuation, it is true the amount the jury returned as its verdict is the highest amount testified to and this testimony was by the landowner. This Court has permitted the landowner to testify as to the value of his land within certain limits. In State Highway Comm'n v. Barnes, 151 Mont. 300, 305, 443 P.2d 16, this Court, quoting a prior case, said:

"We now restate the rule to be that an owner, upon
prima facie proof of ownership, shall be qualified to
estimate in a reasonable way the value of his property
for the use to which he has been putting it. Such owner
is not qualified by virtue of ownership alone to testify
as to its value for other purposes unless he possesses, as any
other witness as to value, "some peculiar means of forming
an intelligent and correct judgment as to the value of the
property in question beyond what is presumed to be possessed
by men generally.""'"

Here, as in Barnes, the landowner testified to the value of the land as it was being used.

While the District argues that Rauser's value testimony is incredible, it should be noted that within the 40 acres involved are all the buildings of the ranch. He testified the water problems began with the commencement of the project: that his two separate basements were flooded; the septic tank would not function; that land near the home is inundated the year around; that he could not use his calving area in the winter and a new one had to be built; that he could not keep corrals clean because of the water; and that he had to get out of the hog business a value to the ranch operation.

With that as a background, he went on to testify as to the value of his ranch before and after the taking. The trial judge did not abuse his discretion in allowing this testimony.

Issue (5). This issue involves attorney fees and consists of two questions. First, does the court have the power to award attorney fees in an inverse condemnation case? Second, were attorney fees properly awarded in this case?

First. Art. II, Section 29, 1972 Montana Constitution provides:

"Private property shall not be taken or damaged for
public use without just compensation to the full extent
of the loss having been first made to or paid into court
for the owner. In the event of litigation, just compensa-
tion shall include necessary expenses of litigation to be
awarded by the court when the private property owner pre-
vails."

The statute implementing the last sentence of Art. II, Section 29, is section 93-9921.1, R.C.M. 1947, which provides:

"The condemnor, shall within thirty (30) days after an appeal is perfected from the commissioner's award or report, submit to condemnee a written final offer of judgment for the property to be condemned, together with necessary expenses of condemnee then accrued.

"If any time prior to ten (10) days before trial the condemnee serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon judgment shall be entered. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible at the trial except in a proceeding to determine costs. The fact that an offer is made but not accepted does not preclude a subsequent offer. In the event of litigation, and when the private property owner prevails, by receiving an award in excess of the final offer of the condemnor, the court shall award necessary expenses of litigation to the condemnee."

For future reference in such controversies, we note here that the 1977 Montana Legislature passed House Bill No. 483, now Chapter 48, 1977 Session Laws. This is an act to define and provide a manner for computing the amount of necessary expenses of litigation required by section 93-9921.1, R.C.M. 1947. While not effective for the instant case, all cases arising after July 1, 1977, the effective date of the act, will come under this act.

In State v. Olsen, 166 Mont. 139, 147, 531 P.2d 1330, the Court found the 1972 Constitution and the statute implementing it required payment of expert witnesses and attorney fees.

We note that section 93-9921.1, R.C.M. 1947, does not use the terms "plaintiff" and "defendant" as do most of the prior sections in the eminent domain chapter, Chapter 99, Title 93.

In Frustuck v. City of Fairfax, 41 Cal.Rptr. 56, attorney fees were denied in an inverse condemnation case. There the court rested its decision on two factors (1) that the word "defendant" was used in the eminent domain attorney's fee statute indicating that the

attorney's fee statute applied only to the statutory procedure, and (2) there was no constitutional requirement that attorney fees be paid in an eminent domain action in California.

However, in a recent case, Holtz v. San Francisco Bay Area Rapid Transit District, 131 Cal.Rptr. 646, 552 P.2d 430, 436, footnote 8, the court notes:

> "It is asserted that since federal law makes it clear that litigation costs are not recoverable in an inverse condemnation if a 'tort' is alleged, section 1246.3 must be interpreted so as to prohibit the award of litigation costs in actions alleging damage to real property. Aside from the fact that no such limitation is made by section 1246.3 and that, as we conclude above, the loss of lateral support may be characterized as a taking of an interest in real property, this argument ignores the established principle that recovery in inverse condemnation is based on the constitutional provision requiring just compensation, not on a theory of tort. (Reardon v. San Francisco, supra, 66 Cal. 492, 505, 6 P. 317.) We have consistently rejected the contention that the right to recover in eminent domain derives from tort doctrine, emphasizing that as a matter of policy the owner of property taken or damaged for public use should not contribute a disproportionate share of the cost of a public undertaking. [Citing cases]"

In Montana, precisely the opposite is true. "Condemnor" and "condemnee" are used in the attorney's fee statute in contrast to the rest of the chapter which speaks of "defendant" and "plaintiff". Further, there is a clear constitutional requirement that attorney fees be paid in condemnation cases where the landowner prevails. Attorney fees are permissible in inverse condemnation cases in Montana.

Second. The District alleges no attorney fee is proper in this case because there was no final offer as required by statute. This same objection was discussed in Olsen where the Court said:

> "To adopt such a theory here would contravene the intent of the statute and would violate the constitutional mandate. Article II, Section 29, 1972 Constitution requires that a landowner be compensated for necessary expenses of litigation if he prevails. This constitutional directive cannot be frustrated by inadvertent or intentional violations of statutory procedure." 166 Mont. 147.

While it is understandable the District in this inverse condemnation action did not wish to follow the statutory condemnation procedure, that may not be used to deny plaintiffs their attorney fees. In the instant case a $30,000 bid for work that would have cured the problem was rejected as being too costly. The amount the project was expected to cost was around $6,000. By inference it seems clear the $100,000 verdict exceeded the "final offer" of the condemnor.

Defendant next questions whether such fee may be awarded where no evidence was taken as required by Crncevich v. Georgetown Recreation Corp., 168 Mont. 113, 541 P.2d 56, 59, 32 St.Rep. 963 and First Security Bank of Bozeman v. Tholkes, _____ Mont._____, 547 P.2d 1328, 33 St. Rep. 341. In Tholkes this Court vacated the judgment on attorney fees and remanded the cause for an evidentiary hearing on attorney fees. Here, since the state or political subdivision must pay the attorney fees, there is even stronger reason to remand the instant case for consideration of the factors set out in Crncevich and Tholkes. Under the 1889 Constitution fees in condemnation cases were percentage contingency fees. In the private agreements the parties protected their own interests but where the fee is to be paid by the state there is no incentive for the landowner to bargain to keep the percentage reasonable.

Clearly success is an important factor in setting an attorney fee. The "result secured" is among the factors set out in Crncevich and Tholkes, but it is not the only factor and all must be considered and weighed to arrive at a reasonable fee. We wish to make clear that there is absolutely no intent to imply in any way that the fee in the instant case is unreasonable, but only to require that the

- 15 -

reasonableness of the fee be shown by evidence. Often those unfamiliar with the difficulties and complexities involved in an action, especially such a one as the instant inverse condemnation action, see only the lump sum figure for attorney fees and think it unreasonable. By producing evidence as to the amount of time and effort involved, that simplistic judgment should disappear.

Issue (6). The sufficiency of the description of what was taken. It was clear to the jury, which had viewed the land, and the parties what land was involved, but as to third parties and subsequent takers a legal description of the land including a survey of metes and bounds should be furnished and made a part of the judgment.

Judgment is affirmed in part, and remanded in part to the trial court for further hearings as directed by this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices.

Mr. Justice Frank I. Haswell:

I concur in the result.

_____
Justice

- 16 -